Linda Roberta POND, Plaintiff-Appellant,

v.

BRANIFF AIRWAYS, INCORPORATED, Defendant-Appellee.

No. 73–1372.

United States Court of Appeals, Fifth Circuit.

Sept. 9, 1974.

**162**

Bob Hoblit, Odessa, Tex., for plaintiff-appellant.

James P. Scanlan, Gen. Counsel, E.E.O.C., Washington, D. C., amicus curiae.

R. A. Wilson, Amarillo, Tex., for defendant-appellee.

Before BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.

JOHN R. BROWN, Chief Judge.

Appellant, Ms. Linda Pond, brought suit against her former employer, Braniff Airways, Inc., alleging unlawful discrimination against appellant because of her sex in violation of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. She alleged that in filling the position of Customer Service Agent at the Amarillo terminal, Braniff refused to consider her application for transfer and instead selected a non-Braniff male applicant, Mr. Gerald Kern, for the job. She further alleged that Braniff's 5'8" height requirement for the position in question discriminated against women as a class and herself in particular.

After a trial to the Court, the District Judge concluded that Braniff had not discriminated in refusing to select Ms. Pond and that the minimum height requirement for a Customer Service Agent was not used to exclude Ms. Pond from consideration. Because the District Judge's opinion does not sufficiently inform us whether he applied the correct legal standards in reaching his ultimate decision, we must reverse and remand the case for his further consideration and elaboration. We therefore need not reach the issue whether Braniff's 5'8" height requirement was used to discriminate against Ms. Pond.

Ms. Pond (5'4", 145 pounds) had been employed for nearly a year as a reservationist at Braniff's Amarillo terminal when she was notified that her position would be phased out due to a system-wide economy drive by Braniff, and that positions comparable to hers would be made available to herself and other Amarillo reservationists in other cities. Having no desire to leave Amarillo, appellant submitted her application for the position of Customer Service Agent, a job which prior to Braniff's economy move was filled by a woman handling predominantly secretarial duties.

At the time Ms. Pond applied, however, the job's character had changed radically. The person who would fill the position had to be able to handle not only the desk work of a normal Customer Service Agent but also occasionally the physical labor of loading and unloading baggage and freight usually done by a cargo worker. For example, a Braniff employee-witness testified at trial that a Customer Service Agent might have to assist in the loading or unloading of up to several hundred pounds of cargo as unseemly as rock bins and caskets. It was also Braniff's opinion that because of the size of the Boeing 727 aircraft that normally flew in and out of the Amarillo terminal, it would take a person of considerable height—in Braniff's opinion at least 5'8" or over—to be able to reach the latches on the cargo bin doors.[1]

After submitting her application for the position, Ms. Pond had a discussion with Mr. O. B. Robbins, the local manager of the Amarillo terminal, at which time he told her he did not think a woman could handle the job of Customer Service Agent because of the job's strenuous lifting and reaching requirements. Shortly thereafter, a non-Braniff applicant, Mr. Gerald Kern, was hired for the position. In contrast to Ms. Pond, Mr. Kern was 6'4" tall and weighed 175 pounds.

After being denied the job, Ms. Pond filed a complaint with the Equal Employment Opportunity Commission alleging Braniff discriminated against her on the basis of sex in refusing to hire her. During the EEOC investigation, appellant was referred by Braniff to a doctor in an apparent attempt to convince both the EEOC and Ms. Pond she

---

1. According to Braniff's official job description, the position of Customer Service Agent . . . includes Departure Lounge Agents, Ramp Agents, Forms Agents and Ticket Counter Agents. The reason being that in a station the size of Amarillo, the Customer Service Agents must perform all of these duties. Customer Service Agents at Amarillo will also perform any or all duties listed under the heading of Cargo Serviceman, whenever Cargo Servicemen are not available or those available require assistance to complete the work on time. Their duties and responsibilities include, but are not limited to the following:

1. Plan ground equipment need and have it in place before the aircraft arrives.
2. Guide the aircraft in and out with care; get assistance if the ability to maneuver aircraft in close quarters is questionable.
3. Prepare loading plan for local bags, mail and cargo on; watch bin loading to preserve order and sequence of removal as required by downline stations.
4. Monitor all functions to ensure that no element of ramp service is lagging. Watch the clock, advise the ramp service people how many minutes until departure.
5. Keep in touch with the hostess/purser for last minute needs, watch the flight deck for requests or signals, keep the departure lounge agent informed.
6. Call for boarding as soon as the cabin can accept passengers.
7. Give the start engines signal so that the flight can roll out on time.
8. Guide aircraft out from the blocks carefully.
9. Furnish load information at once to Operations Agent so the Flight Dispatch report can be on its way to the next station before the flight is airborne.
10. Position the ramp equipment and make ready for the next arrival.
11. These Agents are also responsible for connecting the ground power unit to the aircraft, plus attaching the air start cart if the APU on the aircraft is inoperative.
12. The Agent must make certain that all flight coupons have been lifted—that all people in the lounge area are for flight arriving/departing.
13. Keep in touch with ramp agent for flight being handled—boarding passengers as soon as aircraft cabin can accept them.
14. Estimate standbys, call for extra meals, if required, as soon as the need is anticipated.
15. The Agents will be required to clean the cabin of overnight aircraft if cleaners are [sic] cargo servicemen are not available. In stations that do not have cargo servicemen or cleaners, then the Customer Service Agents will be required to clean the cabin or turn around overnight aircraft.
16. In stations that do not have cargo servicemen or cleaners, the Customer Service Agents will be required to clean the ramp equipment plus all Braniff areas such as Departure Lounges, offices, etc.

was not physically qualified for the more strenuous activities involved in being a Customer Service Agent. The doctor's opinion, however, was that Ms. Pond was physically fit and "could lift within her ability", although at trial he did state that for the particular position in question as between herself and Kern Ms. Pond was not the better qualified applicant.

Ms. Pond likewise filed a grievance under the collective-bargaining agreement in force between Braniff and her union, the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees. The grievance was based on a clause in the union contract which would presumably give Ms. Pond, as a Braniff employee with seniority, an absolute right to the job of Customer Service Agent over a non-Braniff applicant if Braniff determined she were fit and able to handle the job.[2] The results, if any, of arbitration areas of yet unknown.

At trial it was stipuláted that although provisions of the union contract would not be considered as a basis in themselves for the discrimination suit, they could have an evidentiary bearing and relevancy to the issue of whether or not there had been any discrimination.[3]

After hearing the evidence, the District Judge concluded in his Memorandum Opinion [4] that Braniff did not discriminate in summarily hiring Mr. Kern

2. Article 7—PROMOTIONS, ASSIGNMENTS, AND DISPLACEMENTS:
 All promotions, assignments, and displacements, made under the provisions of this Agreement, shall be based on seniority, fitness and ability. If fitness and ability is sufficient to perform the work in a satisfactory manner, seniority shall prevail. "Fitness and ability" shall be determined by the Company, subject to the right of appeal by an employee when the Company has acted either arbitrarily or capriciously. The word "sufficient" is intended to more clearly establish the right of the senior employee to bid a new position or vacancy where two or more employees have adequate fitness and ability.

3. THE COURT:
 . . . I am going to rule right now that even though Plaintiff is not trying to sue under a contract, that this contract is evidentiary or has a bearing and relevancy on the issue of whether or not there has been sex discrimination although I recognize it is not the theory of recovery and unless the plaintiff intends to introduce the contract as a basis for recovery, I will overrule and permit him to talk about it so long as it shows what influence it might have on any discrimination that might be present in the case.
 MR. HOBLIT: [Counsel for (Ms.) Pond]
 Yes, Your Honor. In other words, the Union contract is merely for stating personnel rules and mainly as concerns the seniority that this lady would have.
 THE COURT:
 How the rules applied to her one way and somebody else in another, something of that order.
 MR. HOBLIT:
 This is correct.

4. The Memorandum Opinion reads in pertinent part:
 The requirements for the job therefore show a need for someone who has the ability to 1) perform routine office work, 2) lift weights of considerable degrees, and 3) reach an elevated cargo hatch for opening, loading and unloading the planes.
 The qualifications that each individual applicant in this case possessed to meet these requirements were 1) one (Mrs. Pond) was five feet four inches compared with another (Mr. Kern) who was six feet four inches; 2) Mrs. Pond weighed 140 pounds and Mr. Kern 175 pounds.
 Based on the requirements for the job and the duties to be performed and in light of the qualifications each possessed, it cannot be said that Braniff made a choice based on sex in choosing Mr. Kern. The Court specifically finds that Mr. Kern was chosen by Braniff solely because Braniff felt that he could perform the job better, and that the choice was not made because of his sex or her sex.
 Plaintiff contends, however, that she must be given the opportunity to demonstrate her ability to perform the job, and points to Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969) in support of her contention. Bowe, however, is not in point. In Bowe women employees were restricted to jobs that required lifting of less than 35 pounds, while men were allowed to bid on any job. The Court held that Colgate had to allow women to demonstrate their ability to perform jobs that required lifting over 35 pounds. What Colgate had, in effect, was a dual system of job bidding for its employees—one for men and another for women. This was not the case with Braniff. Braniff ap-

because he was bigger and thus ipso facto better able to handle the physical requirements of being a Customer Service Agent, and that the 5′8″ requirement was not used to exclude Ms. Pond from consideration for the job.

To begin with, we are not at all certain that in reaching his conclusion of non-discrimination, the District Judge either applied the correct legal standards as required by Title VII or fully considered all the ramnifications of his decision. There are too many questions left unanswered by the Memorandum Opinion that must be resolved before we as an appellate court can pass on either the correctness of the conclusions of law or the sufficiency of the evidence in general. In the remainder of this opinion, therefore, we undertake to elucidate what we consider to be the correct legal framework within which the District Judge should view this case on remand as well as some of the problems and inconsistencies we find in the simple viewing of this particular fact situation as posing the sole question whether it was discriminatory under Title VII to select

a larger male over a smaller female for a job involving heavy lifting.

We begin our analysis by recognizing that the situation presented by this case is certainly a novel one upon which few courts have had an opportunity to rule. The bulk of sex discrimination cases in our Circuit have dealt with situations where an employer, in attempting to exclude a woman or women as a class from a particular position, has relied solely on the Bona Fide Occupational Qualification under § 42 U.S.C.A. § 2000e–2(e)(1)[5] as a defense to their actions.[6] In the present situation, however, Braniff chose specifically not to rely upon the very narrowly construed BFOQ exception, but rather asserts that no discrimination took place at all.

 Of course it is true, as urged by Braniff, that where an employer can demonstrate no discrimination in the selection or advancement of employees, but rather that the employer in the best of faith merely weighed each person's talents then choosing the man over the woman (or the woman over the man), no case is made out under Title VII.[7] But

plied the same criteria to both the plaintiff and Mr. Kern, and a comparison of each of their individual qualifications and characteristics resulted in a reasonable decision to hire Mr. Kern. In other words, one standard was applied to both equally. Braniff, therefore, was not required to give Mrs. Pond the opportunity to demonstrate her ability to perform the job, but was entitled to choose the applicant it felt would more satisfactorily perform the assigned duties.

Plaintiff also points to a 5′8″ height requirement that Braniff had on a system-wide basis for this position as being discriminatory toward women in general and Mrs. Pond in particular. The evidence shows that the 5′8″ requirement was not used (at the time the position in question was filled) to exclude Mrs. Pond from the job. Even though Braniff officials felt that Mrs. Pond was not as qualified as Mr. Kern to handle the job, it cannot be inferred that since she was not 5′8″ she could not have the job. In choosing between the two, the lifting requirements would be enough to reasonably preclude Mrs. Pond from the position. The height requirement of 5′8″ was not used in this

case in a discriminatory manner against Mrs. Pond.

5. 42 U.S.C.A. § 2000e–2 . . .
 (e) Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, * * * on the basis of his * * * sex, * * * in those certain instances where * * * sex * * * is a *bona fide occupational qualification* reasonably necessary to the normal operation of that particular business or enterprise, * * * (Emphasis added.)

6. See, e. g., Weeks v. Southern Bell Telephone & Telegraph Co., 5 Cir., 1969, 408 F.2d 228; Phillips v. Martin Marietta Corp., 5 Cir., 1969, 416 F.2d 1257 (en banc, Brown, Chief Judge, dissenting) rev'd per curiam, 1971, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613; Rosenfeld v. Southern Pacific Co., 9 Cir., 1971, 444 F.2d 1219.

7. Phillips v. Martin Marietta Corp., 1971, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613; Rosenfeld v. Southern Pacific Co., 9 Cir., 1971, 444 F.2d 1219. An analogy can also appropriately be drawn to the Equal Pay Act which permits an employer to discrimi-

the inquiry does not necessarily stop here. Courts must be extremely careful to determine that the reasons given for selecting a male applicant over a female applicant are not simply a ruse disguising true discrimination. Courts must further carefully scrutinize the employer's explanations for its conduct once the aggrieved employee has proved a prima facie case of discrimination. If the capacity or competency distinction upon which the employer's selection is based inheres in the nature of an employee as a man or a woman, or if the employer in any way permits stereotypical culturally-based concepts of the abilities of people to perform certain tasks because of their sex to creep into its thinking, then Title VII will come to the employee's aid.[8] The line that must be drawn is a fine one—because interpreting an employer's motives on the basis of its actions is at times hazardous, especially when there exists potentially valid and seemingly plausible business explanations as to such actions which in fact mask a true intent to discriminate.

■ Where the only basis in a record for finding that a male employee-applicant was more qualified than a female are factors directly relatable to sex—the attributed capacity of a male to lift bigger and better boxes—then we are not at all certain that a fact finding of non-discrimination can stand when no objective tests were given either applicant to determine their physical abilities to perform the job in question. We do not at

all intimate that in every instance where an employer must select between a male and female employee for a position involving heavy lifting, that the employer must necessarily objectively determine their physical capacities. The lack of such an objective determination, however, may ultimately be considered as evidence of the employer's good or bad faith and the use of a permissible or non-permissible criteria.[9]

■ We are troubled a good deal by the interplay of the union contract granting Ms. Pond absolute seniority rights for this job if Braniff determined she were qualified accepting its interpretation at face value.[10] We must take into account as the District Court indicated, the union contract since it may establish the special status of an employee by virtue of its contractual terms and thereby form a basis from which a deviation could indicate an intent to discriminate.[11] Nonetheless, no mention is made of the union contract or Ms. Pond's rights thereunder in the District Court's Memorandum Opinion. If it were admitted as it seems to be that Ms. Pond had an absolute seniority right under the contract to the job of Customer Service Agent should Braniff determine she were qualified, Braniff's actions in regard to summarily rejecting Ms. Pond are difficult to explain. This leads us to another facet of the same problem.

On the one hand, Braniff chooses not to rely upon the BFOQ[12] which, if prop-

nate between the wages paid to a male and female employee if the employer can prove their respective jobs involve unequal skills, effort, working conditions, or responsibilities. 29 U.S.C.A. § 206(d)(1). See Shultz v. First Victoria National Bank, 5 Cir., 1970, 420 F.2d 648; Hodgson v. Brookhaven General Hosp., 5 Cir., 1970, 436 F.2d 719.

8. Cf. Bowe v. Colgate-Palmolive Co., 7 Cir., 1969, 416 F.2d 711.

9. Like legal and judicial opinions the doctor's opinion (see Text pp. 163 and 164 supra) really stated the problem, not an answer to it. To "lift within her ability" does not indicate what that ability is in terms of likely lifts on this particular job.

10. Of course, it has on many occasions been stated that the interpretation and application of a union contract is within the sole province of the arbitrator. Alexander v. Gardner-Denver Co., 1974, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147; United Steel Workers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424, and we in no way mean to imply that courts may usurp this well-established prerogative.

11. It is significant that Braniff did not challenge Ms. Pond's "fitness and ability". (See note 2 supra).

12. See note 5, supra.

erly proven, would permit Braniff justifiably to reject a female applicant for a position involving extremely heavy lifting based solely on the fact that she was a female.[13] Yet, on the other hand, from our reading of the record, Braniff offers no explanation as to why Ms. Pond was never given a chance to demonstrate she was qualified and have Braniff evaluate more than just her superficial credentials of being a 5'4", 145 pound female. Braniff comes dangerously close, in our opinion, to relying on the BFOQ without having to actually assert or prove it.

In sum, we think that the District Judge did not go far enough in his analysis of the case by stating that Braniff did not discriminate in choosing a larger and heavier male for the job. We have set forth in our opinion what we consider to be the correct legal standards as well as additional factual considerations for the District Court to ponder on remand. It also goes without saying that once Ms. Pond has proved a prima facie case of discrimination, the burden must shift to Braniff to either disprove discrimination or demonstrate its actions were covered under the BFOQ defense.

We therefore reverse and remand this case for reconsideration, redetermination, and the making of appropriate findings and conclusions in light of this opinion, on the present record or on a supplemental record as the parties think is wise or as directed by the District Court.

Reversed and remanded.

13. A situation similar to the one at bar occurred in Weeks v. Southern Bell Telephone & Telegraph Co., 5 Cir., 1969, 408 F.2d 228, where the employer, operating under a union contract requiring the senior-most bidder to be awarded an available job if qualified, rejected the application of a woman employee for the position of switchman in favor of a male employee with less seniority. Southern Bell in this instance chose not to challenge the charge of discrimination, but instead relied upon the BFOQ which was in turn based on a state law prohibiting women from lifting over 30 pounds. In rejecting the employer's defense, we stated that we would construe the BFOQ very narrowly with a great burden on the employer to justify its use, and that the assumption that all women could not lift over 30 pounds was in this instance unproven and unfounded except on the unrealistic basis of romantic paternalism. Thus, in view of the Weeks decision, Braniff may have chosen an untested course in choosing to challenge the initial charge of discrimination rather than relying upon the BFOQ defense.